UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SULLIVAN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ENK INTERNATIONAL, LLC

                Plaintiff,

      v.

MORGAN GANTT and JEFFREY WHITE

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COMPLAINT

08 CV 8007

Civ. No. _____

RECEIVED
SEP 16 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff ENK International, LLC ("ENK"), by its undersigned attorneys, alleges the following:

## NATURE OF THE ACTION

1.    This action concerns the wholesale theft of ENK's principal assets - the extraordinarily detailed list of exhibitors, buyers and other contacts, amassed by the business's entrepreneurial founder, Elyse N. Kroll, over 27 years of dedicated work and service to the fashion industry. With that base of client information (including the names of thousands of the exhibitors' key personnel, phone numbers and e-mail addresses, those exhibitors' pricing arrangements, display space requirements, and other special needs, and just as importantly, in order to promote the tradeshows to ultimate success for all involved, the names of thousands of the buyers' key personnel, phone numbers and e-mail addresses), ENK has built the nation's premier fashion industry tradeshow business, so much so that a private equity firm recently purchased a large majority stake in the company.  But that business's bright future is now threatened by the brazen act of two former employees, who, for their own nefarious purposes (one to launch a related business, the other shortly after being terminated for insubordination), have literally stolen the core of this company - its client contacts, pricing information and other

client confidences. In a computer crime reminiscent of the "Brink's Job," these two former employees—one still on the job at the time, the other recently fired—conspired together to secretly download, without authorization, hundreds of electronic files constituting thousands of hard copy pages of confidential records detailing ENK's client base and promotion of its two most recent fashion industry tradeshows ("Blue" and "The Collective"). That mass of documents is an invaluable blueprint for operating a successful fashion industry tradeshow business.

2.      Gantt, then still employed by ENK, conspired with White, a former ENK employee terminated for insubordination only weeks earlier, to identify, access and transmit without authorization five spreadsheets listing hundreds of ENK's important contacts at fashion industry exhibitors and retailers. After succeeding in that heist, the two conspired in an even more ambitious theft. Two days later, Gantt and White accessed, copied and removed from ENK two electronic folders containing more than 660 documents totaling several thousands of pages that detailed every aspect of the "BLUE" and "The Collective" tradeshows, including their complete exhibitor and retailer contact lists, invoices and pricing information, floor design and décor and other commercially valuable information.

3.      In addition, Gantt, while still employed at ENK and utilizing ENK time and resources, leveraged her access to ENK's confidential exhibitor list to found MyTempO! Staffing, a private temporary employment agency targeting exhibitors in the fashion tradeshow industry. Gantt's reckless and irresponsible operation of this conflicting business has not only harmed ENK through the misuse of its confidential information, but has potentially imperiled ENK's relationships with the venues at which it hosts its events (including, for instance, the Jacob Javits Center), which have strict rules regarding union membership for employees working at the venue.

4. The information Gantt and White misappropriated from ENK, though of great value to Gantt's fledgling business, has even far greater value to any of ENK's many and committed competitors, as it would permit them to instantly close the commercial gap between a competitor and ENK, the industry leader. Not only is the information Gantt and White misappropriated valuable to them and others, it is potentially devastating to ENK's business, as the damage caused by the misappropriation of such trade secrets is irreparable. Gantt and White stole precisely, and with specific intent, those very trade secrets that have permitted ENK to be the industry leader for decades.

5. ENK asserts a claim against Gantt and White for violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, as well as claims under New York law for conversion, misappropriation of trade secrets, breach of loyalty and civil conspiracy.

## PARTIES

6. ENK International, LLC ("ENK") is a corporation organized under the laws of the State of Delaware with its principal place of business in New York City.

7. Morgan Gantt ("Gantt") is an individual and a resident of the State of New Jersey. Until the termination of her employment at ENK on August 21, 2008, Ms. Gantt worked as a Project Coordinator for ENK, with responsibility for executing the floor décor for ENK's tradeshows. Gantt is doing business as MyTempO! Staffing, a temporary employment agency not registered to do business in the states of New Jersey, New York or Delaware.

8. Jeffrey "Jay" White ("White") is an individual and a resident of the State of New York. Until the termination of his employment at ENK on July 21, 2008, Mr. White worked at ENK as an Assistant Show Coordinator, with assisting responsibility for various aspects of several of ENK's tradeshows.

3

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1030 and 28 U.S.C. § 1331.

10.    Venue in this district is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to ENK's claims occurred at ENK's offices in the Southern District of New York.

## FACTUAL ALLEGATIONS

**A.    ENK's Business and Market Leadership**

11.    Based in New York City, ENK is the leading trade show organization serving the upscale fashion marketplace.  Elyse N. Kroll founded the company in 1981 and steadily built it over the following 27 years, utilizing her years of experience in the high fashion world and her unrivaled relationships and connections with not only fashion designers, but with the key buyers for department stores and fashion retailers across the country.  Kroll and ENK nurtured those relationships, expanding to include in their events thousands of designers and tens of thousands of retailers and purchasers.  ENK and Kroll put those relationships to work for the benefit of all involved, producing high-fashion tradeshows across the United States, connecting designers and retailers at more than twenty events annually in New York City, Los Angeles and Las Vegas.

12.    The contact lists ENK has developed and updated over more than 27 years in the industry include not only basic corporate names and addresses, but also the specific, individual points-of-contact for each exhibitor and retailer, typically including names, telephone and facsimile numbers, e-mail addresses and specific interests or needs.  These lists constitute highly confidential and proprietary business information of critical importance and great value to ENK, and of great interest and incalculable value to those who might seek to compete with ENK.

13.     ENK maintains this information, along with the other vital information for each of its fashion trade shows, in electronic folders on its password-protected computer network. ENK provides access to its computer network, and each trade show's electronic folder, to only those individuals that ENK authorizes and provides with the network logon and password necessary log onto its network.

14.     On September 16, 2008, ENK will once again sponsor its "Coterie" event. Coterie is an unrivaled marketplace for women's high-end designer, contemporary and lifestyle fashion, and is a "must attend" exhibition for more than 15,000 buyers and 1,200 sellers of high-end women's fashion.  ENK's events are open to the fashion trade and media, though attendees must have appropriate credentials, and access to the events is limited at ENK's discretion.

**B.     ENK's Employment of Gantt and White**

15.     Gantt, recently a fashion school student, was employed at ENK as a Project Coordinator.  Gantt was an entry-level employee with responsibility for executing the floor décor for ENK's tradeshows.

16.     White was employed at ENK as an assistant show coordinator, with assisting responsibility for various aspects of several of ENK's tradeshows, primarily ENK's tradeshows "Blue" and "The Collective."

17.     ENK granted Gantt and White access to ENK's computer network as a necessary function of their employment with and responsibilities for ENK.  As part of that access, ENK entrusted Gantt and White with certain logon and password information for the ENK computer systems.

**C.     ENK Terminates Jay White For Insubordination**

18.     On July 21, 2008, ENK terminated White for gross insubordination in his role as Assistant Show Coordinator for ENK's fashion tradeshows.  On that morning, ENK's

tradeshows "Blue" (a collection of denim wear) and "The Collective" (a collection of men's clothing, accessories and footwear) were opening at the Show Piers at Pier 92 and Pier 94 (respectively) in New York City. Just prior to the shows' opening, White had a heated verbal exchange with the show director, using multiple expletives and displaying clearly inappropriate behavior. White's actions were so inappropriate that ENK terminated White immediately, despite his substantial responsibilities for the two shows that were set to open within hours.

**D.     ENK Uncovers Gantt's Secret and Conflicting Personal Business**

19.     In or about May 2008, senior management of ENK was informed by a concerned employee that Gantt appeared to be operating an independent business from her work space at ENK. Gantt's outside business, a personal temporary employment agency targeting exhibitors at fashion tradeshows -- including ENK sponsored shows -- occupied her during her work hours at ENK. Gantt utilized ENK's computer and telephone, leveraged her access to ENK events and to its critical exhibitor lists, and used other ENK resources as part of this surreptitious and unauthorized outside business. The ENK resources, contacts and access Gantt manipulated to her own benefit were critical to Gantt's fledgling business.

20.     ENK executives considered terminating Gantt after first learning of her personal business, but decided that her immediate firing would have been too disruptive to their busy summer show schedule. ENK's senior executives, did however, conduct further investigations into Gantt's activities at work. They attempted to observe her inappropriate use of ENK's computer, and on one occasion stood directly behind her as she appeared to be assisting someone gain temporary employment. When confronted with that information, Gantt claimed she was simply posting a resume on an internet website for a friend.

21.     Continuing its investigation, ENK installed computer monitoring software on the ENK computer Gantt used at work.  That software included a function that collected and saved (every three minutes) "screen shot" images of what Gantt's computer monitor pictured.

**E.     ENK Discovers the Full Scope of Gantt's Personal Business and Terminates Gantt**

22.     On Thursday, August 21, 2008, Joel Boruchow, an ENK Executive, and Kathryn Kerge, ENK's human resources consultant, reviewed some of the screen shots of Gantt's ENK computer that had been generated and saved by the computer monitoring program ENK installed.

23.     The screen shots Kerge and Boruchow reviewed provided compelling evidence that Gantt was operating MyTempO! Staffing, her private temporary employment business, from ENK's offices during work hours, utilizing ENK's resources and leveraging her connections and access she gained through her employment with ENK.

24.     Even more critical, these same screen shots also provided evidence that Gantt was staffing temporary employees for Coterie, ENK's high-end women's fashion tradeshow scheduled for September 16-18, 2008.  A screen shot saved by the computer monitoring program at 2:45 p.m. on Monday, August 18, 2008 (during ENK business hours), attached to Kerge's affidavit as Exhibit 1, depicts an e-mail Gantt received from a vendor scheduled to participate in the Coterie show, inquiring about hiring "a few people for the 3 days of Coterie." The e-mail, which Gantt read from her ENK computer during work hours, was sent to an e-mail address titled Staffing@mytempostaffing.com.

25.     Another screen shot, saved at 1:23 p.m. on Thursday, August 21, 2008 (during ENK business hours), attached to Kerge's affidavit as Exhibit 2, depicts Gantt's Hotmail e-mail inbox, showing the sender and message names for 25 of Gantt's e-mails.  Of those 25 messages, nine explicitly mention ENK's Coterie show in the subject line, while many more

were clearly sent by individuals seeking temporary employment. These e-mails provide even further proof that Gantt was, in fact, staffing temporary employees from her own agency for ENK's exhibitors at its upcoming Coterie show.

26.     After Boruchow and Kerge reviewed the evidence of Gantt's activities as shown in the screen shots from Gantt's computer, ENK decided it could no longer risk employing Gantt and decided to immediately terminate her employment, despite the certain disruption it would cause to an upcoming trade show in Las Vegas.

27.     At approximately 5:30 p.m. on August 21, 2008, Boruchow, Kerge and Joanne Mohr, an ENK executive and Gantt's supervisor, informed Gantt that ENK was terminating her employment due to her activities in operating a private temporary employment agency in conflict with ENK during ENK's work hours and utilizing ENK resources to do so.

28.     While Gantt, during the termination meeting, admitted operating a private temporary employment agency, she falsely denied most all of the details ENK knew to be true – that Gantt had operated her business utilizing ENK time and resources and that she had staffed temporary employees for ENK's own fashion tradeshows, including the upcoming Coterie show.

29.     Immediately after terminating Gantt's employment with ENK, Kerge and Mohr escorted Gantt to the work area Gantt shared with several other ENK employees, so that Gantt could collect her personal belongings. Initially, Gantt did so without incident, even offering to demonstrate to Kerge and Mohr that she was only packing her personal belongings and not ENK property.

30.     During Gantt's packing, Kerge asked Gantt to surrender Gantt's Blackberry smart phone, which ENK had provided to her for business purposes. Gantt returned the

Blackberry to Kerge without objection.  In fact, prior to returning the Blackberry to Kerge, Gantt removed a memory card from the device, stating it contained personal photographs.

31.     As Gantt was finishing her packing, Kerge and Mohr observed Gantt remove a portable USB computer storage device (the "USB Drive") from Gantt's ENK computer.  Kerge immediately requested that Gantt turn over the USB Drive, stating that it was ENK property. Suddenly hostile in both language and demeanor, Gantt stated to Kerge that the USB Drive was her personal property and that she would not give it to ENK.  Kerge then asked Gantt to place the USB Drive in the computer and display its file directory to demonstrate that it did not contain any files with ENK's confidential information.  Increasingly hostile, Gantt refused to comply with Kerge's request and instead exited ENK's office and stormed to the building elevator with the USB Drive and her personal belongings.

32.     Mohr and Kerge followed Gantt to the building elevator, again requesting that Gantt either turn the USB Drive over to them or demonstrate its contents.  Kerge explicitly informed Gantt that she believed Gantt was stealing confidential ENK information and told her that doing so was a serious offense.  Gantt once again refused to demonstrate that the USB Drive did not contain any ENK confidential information, instead entering the elevator and exiting the building.

33.     As discussed in greater detail below, it is likely that the USB Drive removed by Gantt from ENK did in fact contain literally hundreds of confidential and proprietary computer files belonging to ENK.

**F.     ENK Discovers Gantt and White's Conspiracy**

34.     After Gantt's refusal to demonstrate the UBS Drive's contents, ENK conducted a further investigation of her improper conduct while employed at ENK.  This investigation included retaining computer forensics and technical services experts, Stroz Friedberg LLC, to

retrieve and review the contents of the ENK computer used by Gantt and the ENK Blackberry Gantt returned after her termination.

35.     ENK's investigation revealed an extensive conspiracy between Gantt and White to steal critical trade secret and confidential information from ENK.

36.     Text messages contained on the Blackberry revealed evidence that Gantt and White engaged in a blatant theft of ENK's trade secret information on August 13, 2008 and August 15, 2008.  In these text messages, White (who had been fired from ENK only weeks before) specifically instructed Gantt (who had not yet been fired) as to which of ENK's confidential and proprietary electronic files Gantt should access and secretly remove.  Gantt, concerned that ENK might discover their surreptitious theft of such vital information asked White how she could send him the requested electronic files without being "traced."  White then told Gantt to "[j]ust upload them directly from your hotmail account don't open them."

37.     The text messages Gantt and White exchanged on August 13, 2008 is as follows:

- White:   Yo please call me b4 you leave the office.

- Gantt:   Ok

- Gantt:   Yo I called u

- White:   ND files in VIP fldr from last collective show all the excel spreadsheets.  Just upload them directly from your hotmail account don't open them.

- Gantt:   How can I do that without it being traced?

- White:   Log on to your hotmail and attach it to the e-mail and don't open them.  Send every xml and xls file

- Gantt:   Ok what's xml?

- Gantt:   Which e-mail do I send it?

- White:   Excel files

- Gantt:    Which e-mail do I send it to?
- Gantt:    Done
- White:    Jaywhitebk gmail.com

**G.    Gantt Improperly Accesses, Copies and E-mails to White ENK's Crown Jewels**

38.    A forensic review of Gantt's computer revealed evidence that Gantt did precisely as White instructed her in that text message conversation. Gantt in fact did access, download and e-mail five Microsoft excel files, in exactly the manner in which White described in their text message exchange on August 13, 2008. In fact, Gantt e-mailed these documents to White *within mere minutes* of their text messages in which he instructed her to do so. On August 13, 2008, Gantt e-mailed White ENK documents named:

- "Celeste VIP Collective & Blue July 08 MASTER E-MAIL.xls"
- "Celeste_VIP Badge List for Velocity.xls"
- "Celeste_VIP Badge List for Velocity V.2.xls"
- "TCJUL2008_AS_SEEN_ON_BLAST.xls"
- "Top Retailer Collective & Blue July 08VIP List Updated 7.7.08.xls"

39.    The first of these files, "Celeste VIP Collective & Blue July 08 MASTER E-MAIL.xls" contains contact information for more than 440 of the retail buyers (from stores such as Barneys and Saks) scheduled to attend ENK's tradeshows in July 2008. For each entry, the file typically includes the retailer's name, key contact individual and that person's title and telephone number. The file also includes a "Comments" field showing ENK's specific comments on that retailer's key contact person.

40.    The second and third of the files Gantt e-mailed to White, "Celeste_VIP Badge List for Velocity.xls" and "Celeste_VIP Badge List for Velocity V.2.xls" respectively contain more than 450 and 160 entries for very important persons, or "VIPs" attending ENK's show. This is an extremely valuable list, as it focuses on which individuals are the most important

buyers for ENK's most important retailers.   These files once again contain the extremely valuable contact information, detailing to anyone in possession of the list, precisely how to contact the VIP's for ENK's retailers.   This contact information includes first and last name, title, telephone number, e-mail address and mailing address.

41.    The fourth file Gantt e-mailed, "TCJUL2008_AS_SEEN_ON_BLAST.xls," contains more than 260 exhibitors and potential exhibitors for ENK's show named The Collective.   This list was created to send a "blast" e-mail to each listed contact at the same time and includes not just the exhibitor's corporate name, but also the key contact person at each exhibitor and his or her e-mail address.   It is that listing of the individual name and e-mail address that is highly confidential and propriety to ENK, as it would permit any potential competitor to easily contact the one person most important for the exhibitor's business.

42.    The fifth file Gantt e-mailed White, "Top Retailer Collective & Blue July 08VIP List Updated 7.7.08," is a very large electronic file, containing more than 130 pages of information regarding more than 440 retailers attending BLUE and The Collective.   This file includes not just the corporate name, but also each retailer's key contact person and ENK's specific comments about that person and their status at the company and/or ENK's shows.   The file also includes former e-mail or mailing addresses for many of the contacts, important to ENK so that it can track its contacts and clients as they may move through the fashion industry.

43.    These five files, which Gantt improperly accessed at White's specific direction and then e-mailed to him precisely as he instructed so as to avoid ENK's detection are ENK's "crown jewels" and would give any competitor a tremendous advantage in closing its competitive gap with ENK.

**H.   Gantt Improperly Accesses, Copies and Misappropriates, at White's Direction, the "Heart" of ENK's Business**

44.    Not content to have stolen ENK's critical contact lists, two days later, on August 15, 2008, White directed Gantt to sneak back into ENK's computers to heist electronic folders containing hundreds of critical files.  Once again, Gantt and White's nefarious conduct was revealed by a series of text messages contained on the Blackberry and located during ENK's investigation.  In the August 15 text message exchange, White appears to be telling Gantt to download to a portable computer storage device two specific folders stored on ENK's confidential computer network, each containing highly confidential and proprietary business information that fairly constitute the "heart" of ENK's business.

45.    The text messages Gantt and White exchanged on August 15, 2008 are as follows:

- Gantt:    What do you want on thi usb?  Hurry I only have a small window to do it

- Gantt:    You're going to miSs out

- White:    The whole TCJUL2008 folder

- Gantt:    It said the master lis is in use can't be used

- Gantt:    I already have the entire blue july 08 folder

- White:    Right click the folder and select copy then open the usb and right click inside of it and select paste

- White:    Cool.  Need that tc folder.

- Gantt:    Ok, even if its in use

- Gantt:    K

- White:    ? You might have to wait.

- White:    Call me

- Gantt:    Got it

- White:     Man did I ever tell you how much I love you.

- Gantt:     Just finished talkikg woith elyse

- White:     Okay

- Gantt:     I'll call you in a few

46.     ENK's investigation further uncovered that Gantt did, in fact, download the two folders White instructed her to steal in their August 15, 2008 text messages.  Gantt downloaded these to a USB drive, again, precisely as White instructed her.  Furthermore, Gantt downloaded the first of these files within minutes of the text message exchange with White.  According to forensic computer research, ENK's documents Gantt downloaded to her USB drive on August 15, 2008 were named "TC JUL 2008" and "BLUE JUL 08."

47.     Collectively, these two folders contain *686 electronic files* in 32 folders, totaling nearly *one-half gigabyte* of electronic data.  While the documents contained in these folders are too voluminous to print and produce, they contain *thousands* of pages of confidential and proprietary trade secrets.  These two electronic folders and the documents they contain provide a complete roadmap showing how ENK plans for, markets, designs, and executes its BLUE and The Collective tradeshows.  Collectively, this information can fairly be characterized as the heart of ENK's business, and it would be a treasure trove of information for anyone seeking to compete with ENK, giving them a direct view into the most critical of ENK's planning, promotion and staging for two of its trade shows.

48.     Among the 686 files White and Gantt conspired to steal from ENK on August 15, 2008 are (i) exhibitor invoices detailing the amount ENK charges exhibitors, (ii) details regarding the tradeshow's floor design and décor, two of the most important aspects that sets ENK's shows apart from its competitors, (iii) marketing and prospecting materials aimed at recruiting new exhibitors and retailers, (iv) draft and final versions of the tradeshow floor maps, and (v) details regarding the vendors, such as caterers and skilled trades people that

ENK relies on to make its shows a success. These folders also contain the critical contact information that Gantt and White had stolen earlier.

49. In total, the files and documents Gantt and White stole from ENK on August 13 and 15, 2008 could serve as a complete road map, permitting anyone with even a rudimentary understanding of the fashion industry to plan, promote and stage their own fashion tradeshows, and compete vigorously with ENK.

## I. Gantt's Use of ENK's Confidential and Proprietary Business Information

50. Gantt is using ENK's confidential and proprietary business information in her MyTempO! Staffing business. This information includes, among other things, ENK's comprehensive lists of thousands of exhibitors and their specific contact information, which is obviously highly valuable to a business that seeks to connect temporary employees to tradeshow exhibitors. Specifically, as the screen shots demonstrate, Gantt has been utilizing ENK's confidential exhibitor contact information in her search for exhibitors that need temporary employees for ENK's Coterie tradeshow.

51. The misappropriation by Gantt and White of ENK confidential, trade secret information has caused and is currently causing irreparable harm to ENK. ENK took appropriate steps to adequately safeguard its confidential information prior to the theft executed by Gantt and White, and ENK is entitled to prohibit others from profiting from the competitive information that ENK has developed over its 27 years in the industry.

52. In addition to the irreparable harm to ENK from the use by others of its trade secret information, there is the potential for additional harm to ENK flowing from Gantt and White's unlawful conduct. As an example, ENK has contractual agreements with the venues at which it produces its tradeshows, including the Jacob Javits Center in New York City, where it will produce Coterie on September 16-18, 2008. These agreements impose numerous and

varied obligations on ENK, often including the requirement that ENK and its exhibitors utilize union labor.

53.   On information and belief, those temporary employees Gantt places are typically not members of any labor union.  ENK's agreement with the Javits Center holds it responsible for its exhibitors' use of non-union labor.  As such, Gantt's actions in staffing temporary employees at ENK shows places at risk ENK's valuable and long-term relationships with the venues at which it produces tradeshows.  (In fact, Javits Center management very recently suggested to ENK that some ENK exhibitors were violating the union labor requirement in their contract, an issue that was immediately clarified and resolved to the satisfaction of all parties.)  The risk that Gantt's employees could further endanger ENK's relationship with the Javits Center or other venues may be increased by any perception that Gantt and the non-union temporary employees she places are ENK representatives or agents.

### FIRST CAUSE OF ACTION
**(Violation of the Computer Fraud and Abuse Act,
18 U.S.C. § 1030)
(Against All Defendants)**

54.   The allegations of paragraphs 1 through 53 are incorporated by reference as though fully set forth herein.

55.   On more than one occasion, including on August 13, 2008 and August 15, 2008, Gantt, acting in concert with White, intentionally accessed ENK's computers and, exceeding their authorized access, obtained information from an ENK computer used in interstate commerce or communication, to wit, Gantt downloaded files and data residing on an ENK computer for her benefit and for the benefit of White.

56.   ENK has suffered damages and losses as a result of the Defendants' conduct well in excess of $10,000 during the immediately preceding one-year period.

57.     In addition, ENK has suffered and continues to suffer injury from Defendants' conduct that is irreparable, and ENK has no adequate remedy at law.  Such conduct will continue to cause such irreparable harm unless restrained by this Court.

58.     ENK is entitled to an injunction prohibiting defendants Gantt and White, and any entity with which they may be affiliated as an agent, employee, owner, consultant, representative, independent contractor or otherwise, from (i) utilizing documents and information obtained from ENK in any manner; (ii) copying, transmitting or in any way further disclosing documents and information obtained from ENK; and (iii) soliciting, contacting or offering to provide any product or service to any exhibitors, retail buyers, venues , vendors or employees whose contact information is contained on the documents obtained from ENK. ENK is also entitled to an order requiring defendants Gantt and White to return to ENK the originals and any and all copies of its documents and information and identify to ENK any other individuals, entities or others to whom Gantt and White further transmitted or distributed its documents and information.

## SECOND CAUSE OF ACTION
### (Civil Conspiracy to Violate the Computer Fraud and Abuse Act)
### (Against All Defendants)

59.     The allegations of paragraphs 1 through 58 are incorporated by reference as though fully set forth herein.

60.     The Defendants entered into an agreement to obtain confidential materials belonging to ENK through misappropriation of its trade secrets and through accessing ENK's computers in excess of their authority to do so, as prohibited by the Computer Fraud and Abuse Act.

61.    One or more of the Defendants has misappropriated ENK's trade secrets and Defendant Gantt accessed ENK's computers in excess of her authority to do so and obtained information from those computers.

62.    Gantt and White intentionally participated in this agreement in furtherance of their plan to improperly access ENK's confidential computer network with the intent to download and convert ENK's confidential and proprietary business information.

63.    ENK has been damaged and suffered losses as a result of Gantt and White's conspiracy in an amount well in excess of $10,000 incurred during the immediately preceding one year period.  Further, Gantt and White engaged in the foregoing conduct willfully and with wanton dishonesty, and directed their conduct not only at ENK, but at the public generally, including ENK's clients and exhibitors, thus justifying an award of punitive damages against Gantt and White in an amount to be determined at trial.

64.    In addition, ENK has suffered and continues to suffer injury from Defendants' conduct that is irreparable, and ENK has no adequate remedy at law.  Such conduct will continue to cause such irreparable harm unless restrained by this Court.

65.    ENK is entitled to an injunction prohibiting defendants Gantt and White, and any entity with which they may be affiliated as an agent, employee, owner, consultant, representative, independent contractor or otherwise, from (i) utilizing documents and information obtained from ENK in any manner; (ii) copying, transmitting or in any way further disclosing documents and information obtained from ENK; and (iii) soliciting, contacting or offering to provide any product or service to any exhibitors, retail buyers, venues , vendors or employees whose contact information is contained on the documents obtained from ENK. ENK is also entitled to an order requiring defendants Gantt and White to return to ENK the originals and any and all copies of its documents and information and identify to ENK any

other individuals, entities or others to whom Gantt and White further transmitted or distributed its documents and information.

### THIRD CAUSE OF ACTION
### (Conversion)
### (Against All Defendants)

66.    The allegations of paragraphs 1 through 65 are incorporated by reference as though fully set forth herein.

67.    By engaging in the conduct described above, Gantt and White converted to their own personal use the property of ENK, specifically ENK's confidential and proprietary business information, consisting of its exhibitor lists, contacts and buyers.

68.    Gantt and White also converted for their own personal use ENK's electronic confidential and proprietary business file labeled Blue July 2008, which includes every document necessary for ENK's fashion tradeshow in July 2008.

69.    Gantt and White also converted to their own personal use ENK's electronic confidential and proprietary business files labeled (i) TC JUL 2008, (ii) BLUE JUL 08, (iii) CELESTE VIP Collective & Blue July 08 MA, (iv) CELESTE_VIP Badge List for Velocity.xls, (v) CELESTE_VIP Badge List for Velocity V.2, (vi) TCJUL2008_AS_SEEN_ON_BLAST.xls, and (vii) Top Retailer Collective & Blue July 08VI.

70.    Gantt and White intended to interfere with ENK's ownership of its confidential and proprietary business information and did actually interfere with ENK's ownership of its property, in defiance of ENK's rights.

71.    ENK has been damaged and suffered losses as a result of Gantt and White's conspiracy in an amount well in excess of $10,000 incurred during the immediately preceding one year period.  Further, Gantt and White engaged in the foregoing conduct willfully and with wanton dishonesty, and directed their conduct not only at ENK, but at the public generally,

including ENK's clients and exhibitors, thus justifying an award of punitive damages against Gantt and White in an amount to be determined at trial.

72.    In addition, ENK has suffered and continues to suffer injury from Defendants' conduct that is irreparable, and ENK has no adequate remedy at law.  Such conduct will continue to cause such irreparable harm unless restrained by this Court.

73.    ENK is entitled to an injunction prohibiting defendants Gantt and White, and any entity with which they may be affiliated as an agent, employee, owner, consultant, representative, independent contractor or otherwise, from (i) utilizing documents and information obtained from ENK in any manner; (ii) copying, transmitting or in any way further disclosing documents and information obtained from ENK; and (iii) soliciting, contacting or offering to provide any product or service to any exhibitors, retail buyers, venues , vendors or employees whose contact information is contained on the documents obtained from ENK. ENK is also entitled to an order requiring defendants Gantt and White to return to ENK the originals and any and all copies of its documents and information and identify to ENK any other individuals, entities or others to whom Gantt and White further transmitted or distributed its documents and information.

### FOURTH CAUSE OF ACTION
### (Misappropriation of Trade Secrets)
### (Against All Defendants)

74.    The allegations of paragraphs 1 through 73 are incorporated by reference as though fully set forth herein.

75.    ENK has developed and is the owner of valuable trade secrets, including detailed intelligence concerning the identities, contact persons, tradeshow experience and needs for each of the more than 1,200 companies that exhibit at ENK's fashion tradeshows.

76.    The trade secrets described herein, as well as other trade secrets, are proprietary to ENK and are not generally known to the public or others who can obtain economic value from their disclosure or use.  ENK derives independent economic value from the fact that these trade secrets are not generally known.

77.    ENK has expended significant efforts and sums of money over many years to obtain, compile, and organize this information, which is unique to ENK.

78.    At all relevant times, ENK has used and continues to use reasonable efforts to protect the confidentiality of its trade secrets.

79.    At all relevant times, ENK has derived an economic benefit and leadership advantage in its industry because of this information and by vigilantly protecting its trade secrets and not permitting or allowing such information to be accessed or used by anyone without express or implied permission.

80.    The value of this information to ENK's competitors is incalculable, as it would take years and extraordinary effort to compile a similar set of information.

81.    ENK provided access to these trade secrets to Gantt and White in confidence with relation to Gantt and White's employment duties at ENK.

82.    On information and belief, Gantt and White have, and continue to, misappropriate, use, and disclose ENK's trade secrets, including but not limited to those described herein.  This use and disclosure was done without the express or implied consent of ENK.

83.    As a direct and proximate result of the Defendants' continuing acts of use and misappropriation and the threatened use and misappropriation of ENK's trade secrets, ENK has been damaged.  ENK has been damaged and suffered losses as a result of Gantt and White's conspiracy in an amount well in excess of $10,000 incurred during the immediately preceding

one year period.  Further, Gantt and White engaged in the foregoing conduct willfully and with wanton dishonesty, and directed their conduct not only at ENK, but at the public generally, including ENK's clients and exhibitors, thus justifying an award of punitive damages against Gantt and White in an amount to be determined at trial.

84.    In addition, ENK has suffered and continues to suffer injury from Defendants' conduct that is irreparable, and ENK has no adequate remedy at law.  Such conduct will continue to cause such irreparable harm unless restrained by this Court.

85.    ENK is entitled to an injunction prohibiting defendants Gantt and White, and any entity with which they may be affiliated as an agent, employee, owner, consultant, representative, independent contractor or otherwise, from (i) utilizing documents and information obtained from ENK in any manner; (ii) copying, transmitting or in any way further disclosing documents and information obtained from ENK; and (iii) soliciting, contacting or offering to provide any product or service to any exhibitors, retail buyers, venues , vendors or employees whose contact information is contained on the documents obtained from ENK. ENK is also entitled to an order requiring defendants Gantt and White to return to ENK the originals and any and all copies of its documents and information and identify to ENK any other individuals, entities or others to whom Gantt and White further transmitted or distributed its documents and information.

## FIFTH CAUSE OF ACTION
### (Breach of Duty of Loyalty)
### (Against All Defendants)

86.    The allegations of paragraphs 1 through 85 are incorporated by reference as though fully set forth herein.

87.    Gantt was an employee of ENK prior to the termination of her employment on August 21, 2008.

88.     During the time of her employment, and specifically by accessing, downloading, copying and transmitting, all without authority, ENK's confidential computer files on August 13 and 15, 2008, Gantt did not act consistently with her agency or trust or exercise the utmost good faith and loyalty in the performance of her duties.

89.     ENK has been damaged and suffered losses as a result of Gantt and White's conspiracy in an amount well in excess of $10,000 incurred during the immediately preceding one year period.  Further, Gantt and White engaged in the foregoing conduct willfully and with wanton dishonesty, and directed their conduct not only at ENK, but at the public generally, including ENK's clients and exhibitors, thus justifying an award of punitive damages against Gantt and White in an amount to be determined at trial.

90.     In addition, ENK has suffered and continues to suffer injury from Defendants' conduct that is irreparable, and ENK has no adequate remedy at law.  Such conduct will continue to cause such irreparable harm unless restrained by this Court.

91.     ENK is entitled to an injunction prohibiting defendants Gantt and White, and any entity with which they may be affiliated as an agent, employee, owner, consultant, representative, independent contractor or otherwise, from (i) utilizing documents and information obtained from ENK in any manner; (ii) copying, transmitting or in any way further disclosing documents and information obtained from ENK; and (iii) soliciting, contacting or offering to provide any product or service to any exhibitors, retail buyers, venues , vendors or employees whose contact information is contained on the documents obtained from ENK. ENK is also entitled to an order requiring defendants Gantt and White to return to ENK the originals and any and all copies of its documents and information and identify to ENK any other individuals, entities or others to whom Gantt and White further transmitted or distributed its documents and information.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff ENK is entitled to:

(a)    A temporary restraining order, preliminary and permanent injunction enjoining defendants Gantt and White, and any entity with which they may be affiliated as an agent, employee, owner, consultant, representative, independent contractor or otherwise, from (i) utilizing documents and information obtained from ENK in any manner; (ii) copying, transmitting or in any way further disclosing documents and information obtained from ENK; and (iii) soliciting, contacting or offering to provide any product or service to any exhibitors, retail buyers, venues , vendors or employees whose contact information is contained on the documents obtained from ENK.

(b)    An order requiring defendants Gantt and White to return of all documents and information belonging to ENK and in Gantt's or White's possession or in the possession any entity with which Gantt and/or White may be affiliated as an agent, employee, owner, consultant, representative, independent contractor or otherwise.

(c)    Compensatory damages, including but not limited to the costs and fees associated with ENK's investigation of Defendants inappropriate access of transfer of ENK's confidential materials, in an amount to be determined at trial, but in any event in excess of $10,000.

(d)    Punitive damages in an amount to be determined at trial.

(e)    Interest and costs, including reasonable attorneys' fees.

(f)    Such other and further relief as the court deems just and proper.

Dated:  September 16, 2008

GIBSON, DUNN & CRUTCHER LLP

By:_____

Randy M. Mastro (RM-9492)
James L. Hallowell (JH-6074)

200 Park Avenue
New York, New York 10166-0193

Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Attorneys for Plaintiff ENK International, LLC

100515792_15.DOC